**No. 22-51041**

---

# In the United States Court of Appeals
# for the Fifth Circuit

---

MELANIE MASON, DOLORES MASON,
*PLAINTIFFS- APPELLEES*,

v.

HELPING OUR SENIORS, LLC
*DEFENDANT-APPELLANT*

---

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

---

**BRIEF OF APPELLEES**

---

Michael V. Galo, Jr.
Texas Bar No. 00790734
mgalo@galolaw.com
GALO LAW FIRM, P.C.
4230 Gardendale, Bldg. 401
San Antonio, Texas 78229
Telephone: (210)616-9800
Facsimile: (210)616-9898
COUNSEL FOR PLAINTIFFS-APPELLEES
MELANIE MASON AND
DOLORES MASON

# I.    CERTIFICATE OF INTERESTED PARTIES

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1) **Plaintiffs - Appellees**

   Melanie Mason and Dolores Mason

2) **Defendant-Appellant**

   Helping Our Seniors

3) **Counsel for Plaintiff- Appellees**

   Michael V. Galo, Jr./Galo Law Firm, P.C.

4) **Counsel for Defendant – Appellant**

   Ryan Reed, Anna K. MacFarlane/Pulman, Cappuccio & Pullen, LLP.


Respectfully submitted,

/s/Michael V. Galo, Jr.
**MICHAEL V. GALO, JR.**
**Attorney of record for**
**Appellees Melanie Mason**
**and Dolores Mason**

## II.    <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellees Melanie Mason and Dolores Mason agree with Appellant Helping Our Seniors that oral argument is unnecessary in this case.  The district court's Findings of Fact and Conclusions of Law are well supported by the record.  The record evidence establishes without question that Helping Our Seniors was subject to Title VII, that Melanie and Dolores Mason were discharged in retaliation for Melanie Mason's protected activities under Title VII, and that the modest awards of compensatory and punitive damages were within the district court's sound discretion.

## III.   TABLE OF CONTENTS

Certificate of Interested Persons……………………………………………………2

Statement Regarding Oral Argument…………………………………………....3

Table of Contents…………………………………………………………………...4

Table of Authorities……………………………………………………………..6

Jurisdictional Statement……………………………………………………....9

Statement of Issues…………………………………………………………..10

Statement of the Case…………………………………………………………..10

　　A. Factual Background……………………………………………………10

　　B. Procedural Background……………………………………………22

Argument & Authorities…………………………………………………..28

Summary of the Argument…………………………………………………..23

　　A. Standard of Review……………………………………………………28

　　B. HOS Had Requisite Number of Employees for Title VII Coverage
　　Because The Company's Caregivers Were Improperly Classified as
　　Contractors and Should Have Been Counted as Employees………………28

　　C. The Record Supports the District Court's Determination that Melanie
　　Mason Engaged in Activities Protected by Both the Opposition Clause
　　And the Participation Clause……………………………………………36

　　D. The Record Supports the District Court's Determination that HOS
　　Discharged the Masons Because of Melanie Mason's Protected
　　Complaints………………………………………………………………43

　　E. Record Supports Award for Mental Anguish Damages………………50

F.  Evidence Supports the Award of Punitive Damages……………………...54

Conclusion……………………………………………………………….…..59

Certificate of Service………………………………………………….…..60

Certificate of Compliance……………………………………………………60

# IV.    <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Booker v. Brown & Williamson Tobacco Co*.,
  879 F.2d 1304, 1312 (6th Cir.1989)……………………………………..39

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485, 501 (1984)……………………………………………..28

*Broussard v. L.H. Bossier, Inc.,*
  789 F.2d 1158, 1160 (5th Cir. 1986)………………………………..30

*Brower v. Runyon*,
  178 F.3d 1002 (8th Cir. 1999)………………………………………...40

*Carpenter v. Miss. Valley State Univ*.,
  807 F.Supp.2d 570, 591 (N.D. Miss. 2011)………………………….40

*Crevier-Gerukos v. Eisai, Inc*.,
  2013 WL 12137089, *6 (S.D. Tex., Jun. 24, 2013)
  (S.D. Tex. 2013) (Rosenthal, J.)…………………………………40

*Croushorn v. Bd. of Trustees*,
  518 F.Supp. 9, 23 (M.D. Tenn. 1980)………………………………..41

*Deal v. State Farm County Mut. Ins. Co. of Tex*.,
  5 F.3d 117, 119 (5th Cir. 1993)………………………………...29, 30

*Deravin V. Kerik*,
  335 F.3d 195, 200 (3d Cir. 2003)………………………………..39

*Diggs v. Harris Hosp.-Methodist, Inc.*,
  847 F.2d 270, 271-72 (5th Cir. 1988)…………………………...24, 29

*Donovan v. Tehco, Inc*.,
  642 F.2d 141, 143 (5th Cir. 1981)………………………………36

*EEOC v. E.I. Du Pont de Nemours & Co*.,
  480 F.3d 724, 732 (5th Cir.2007) ………………………………..54

*Farpella-Crosby v. Horizon Health Care*,
　　97 F.3d 803 (5th Cir. 1996)……………………………………………………50

*Henry v. CorpCar Servs. Houston, Ltd.*,
　　625 Fed.Appx. 607, 614 (5th Cir.. Jan. 27, 2015)……………………………54

*Jute v. Hamilton Sundstrand Corp.*,
　　420 F.3d 166 (2nd Cir. 2005)…………………………………………………39

*Kolstad v. Am. Dental Assn,*,
　　119 S.Ct. 2118, 2124 (1999)………………………………………………..54

*Learned v. City of Bellevue*,
　　860 F.2d 928, 932 (9th Cir. 1988)…………………………………………..39

*Marshall & Ilsley Corp.*,
　　2000 WL 34233699, *18 (W.D. Wis., Sept. 7, 2000)……………………...41

*Migis v. Pearle Vision, Inc.*,
　　135 F.3d 1041, 1045 (5th Cir. 1998)………………………………………..50

*Oden v. Oktibbeha County*,
　　246 F.3d 458, 470 (5th Cir. 2001)…………………………………………..51

*Olsen v. Marshall & Ilsley Corp.*,
　　2000 WL 34233699, *18 (W.D. Wis., Sept. 7, 2000)……………………...40

*Pettway v. Am. Cast Iron Pipe Co.*,
　　411 F.2d 998, 1006 n. 18 (5th Cir. 1969)……………………………….39, 40

*Polk v. Yellow Freight Sys., Inc.*,
　　801 F.2d 190, 200 (6th Cir. 1986)…………………………………………..41

*Robinson v. Shell Oil Co.*,
　　519 U.S. 337, 346 (1997)………………………………………………..40, 43

*Smith v. Wade*,
　　461 U.S. 30, 37 n. 6, 41, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)………..54

*Spirides v. Reinhardt*,

613 F.2d 826, 831 (D.C. Cir. 1979)…………………………………………29

*Switzer v. Wal-Mart Stores, Inc.,*
    52 F.3d 1294, 1298 (5th Cir. 1995)…………………………………………28

*Thompson v. N. Am. Stainless*,
    562 U.S. 170, 177-78 (2011)…………………………………………………37

*Tokio Marine & Fire Ins. Co. v. FLORA MV*,
    235 F.3d 963, 966 (5th Cir. 2001)………………………………………..28

*United States v. Ballis*,
    28 F.3d 1399, 1406 (5th Cir. 1994)………………………………………...52

*United States v. Winkle*,
    587 F.2d 705, 710 (5th Cir. 1979)…………………………………………52

*Vaughn v. Sabine County,*
    104 Fed. Appx. 980, *6 (5th Cir., Jul. 28, 2004)……………………………51

*Wantou v. Wal-Mart Stores Texas, LLC*,
    23 F.4[th] 422, 439 (5th Cir. 2022)……………………………………54, 55

## **Statutes**

28 U.S.C. §1291……………………………………………………………..10

28 U.S.C. §1331……………………………………………………………9

42 U.S.C. § 1981a and (b)(1)……………………………………………54, 55

42 U.S.C. §2000e-3(a)……………………………………………9 ,25, 37, 39

42 U.S.C. §2000e3(b)……………………………………………………..28

42 U.S.C. §2000e-5(f)(1)…………………………………………………37

## **Rules**

Federal Rule of Evidence 103(a)…………………………………………52

Federal Rule of Evidence 103(a)(2)………………………………………52

## V.    <u>JURISDICTIONAL STATEMENT</u>

The district court possessed original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as the Masons' claims arose under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a). This Court has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because this is an appeal from the district court's entry of a final judgment on October 31, 2022 in favor of Appellees Dolores Mason and Melanie Mason.

# VI.    STATEMENT OF ISSUES

1.      Does the evidence support the district court's determination that HOS's caregivers were actually employees under the hybrid economic realities/common law control test, and that as such, HOS had the requisite number of employees for Title VII coverage?

2.      Does the evidence support the district court's determination that Melanie Mason engaged in protected activity under both the opposition and participation clauses of Title VII?

3.      Does the evidence support the district court's determination that HOS discharged Melanie Mason and Dolores Mason because of Melanie Mason's protected activities under Title VII?

4.      Does the evidence support the district court's award of compensatory damages?

5.      Does the evidence support the district court's award of punitive damages?

# VII.    STATEMENT OF THE CASE

## A.    Factual Background

Helping Our Seniors (HOS) provides caregiver services to the elderly in the San Antonio, Texas area.  The business is owned and operated by Martha Cave.  Her husband, Patrick, owns half the business, ROA.415:13-14, and although Ms. Cave

says he was not employed by the company, he performs some work such as invoicing and running errands.  ROA.416:2-8, ROA.514:24, ROA532:10-11.

Although HOS officially employed only a handful of office employees, including Dolores Mason and her daughter, Melanie Mason, it had dozens of caregivers who were the individuals who did the caregiving in the homes of clients. ROA.416:15-417:2, ROA.421:19-20.  These caregivers would, for example, assist clients with cooking, light cleaning, bathing, and driving to appointments, and they would provide companionship.  ROA.411:25-412:25.

HOS classified these caregivers as independent contractors, and at the inception of the work relationship, caregivers were required to sign "Independent Contractor" agreements, ROA.424:14-16, the terms of which were not negotiable, ROA.546:1-3.  On appeal, HOS characterizes its business as a "matching service" for caregivers.  But at trial, Cave explained that this matching service model, which involved HOS placing a caregiver with a specific client and then the client actually paying the caregiver, was abandoned years before the Masons joined the Company. ROA.449:25-450:13.

At all times relevant to this lawsuit, it was HOS that paid the caregivers. ROA.421:8-18, ROA.421:21-422:3.   Indeed, in most ways, these caregivers looked very much like employees.  They were unskilled workers, often with little formal education.  In fact, although a high school diploma and prior experience were

preferred, no prior experience or education was actually required. ROA.428:5-429:17. For instance, as detailed below, Melanie Mason was first hired as a caregiver even though she had no prior experience. ROA.429:12-17. HOS paid the caregivers by the hour, paid them a higher hourly rate when they had to work holidays, and reimbursed them for expenses like parking and mileage. ROA.422:7-11, 423:9-24. Caregivers did not have to supply any equipment, tools, or supplies, and not surprising, ROA.423:25-424:5, ROA.430:15-17, they had no business expenses for which they were required to foot the bill, *Id.*; ROA.423:25-424:2. They were not required to purchase liability insurance, as HOS itself procured and paid for liability insurance covering the acts and omissions of its caregivers. ROA.426:16-427:3.

From the perspective of a caregiver, there was certainly no opportunity for profit or loss. ROA.423:25-424:2. Even the independent contractor agreement that each caregiver was required to sign prohibited the caregiver from assigning any "rights or duties" under the agreement to anyone else without the Company's approval. ROA.432:10-25. In other words, a caregiver could not subcontract the work.

To go to work for HOS as a caregiver, the applicant had to submit an application form and undergo an interview, in much the same way as the office employees. ROA.433:1-434:2. Applicants were also subjected to background

checks. ROA.433:10-12. And when they were hired, caregivers had to undergo orientation, ROA.545:5-8, training, and written testing on a host of policies and procedures they were required to follow—for example, on appropriate conduct in the workplace, dealing with clients, attendance, time keeping, dress code, mandatory paperwork (*e.g.*, daily and weekly reports), health and safety, emergency preparedness, client confidentiality, HIPAA, etc. ROA.434:6-435:13.

When caregivers were assigned to a client with special needs or requirements, they were given on-the-job training by another caregiver on how to care for the client in question. ROA.467:23-468:18. Caregivers received evaluations annually. ROA.545:9-15. HOS demanded that caregivers follow all of the company policies, and if they did not, they were subject to verbal or written reprimand, or if the situation warranted, to immediate dismissal. ROA.435:11-16, ROA.440:2-25, ROA.441:3-13. When the Masons were employed, HOS had a form for disciplining wayward caregivers. ROA.463:16-20. Of course, HOS retained the right to discharge any caregivers at any time and for any reason without notice. ROA.427:25-428:1.

HOS has always prided itself on the fact that many of its caregivers have worked for the Company for years. ROA.429:21-430:3. When a client passes away or moves away from the agency, HOS attempts to reassign the caregiver to another client or clients and maintain the long-term working relationship. ROA.430:4-14.

Melanie Mason went to work for HOS as a caregiver in 2015. ROA.600:21-601:4. As was HOS's practice with respect to all of its caregivers, Melanie Mason was classified as a contractor and was made to sign an independent contractor agreement. ROA.524:19-525:1. Dolores Mason applied to work for HOS as a caregiver in October of 2016. ROA.548:4-11. However, following her application, Martha Cave approached her about also working as an office employee. Dolores Mason commenced work both as a caregiver (classified by HOS as an independent contractor) and as an office employee (classified as an employee). ROA.543:24-544:10.

By her own admission, Cave praised both Melanie Mason and Dolores Mason for their good work. Within a couple of months of being hired, Dolores Mason was promoted to the position of caregiver coordinator. In this capacity, she screened, backgrounded, hired, and evaluated the caregivers. ROA.544:22-25. She also handled caregiver orientations, ensured that caregivers submitted their required Daily Activity Reports on a weekly basis, and conducted annual evaluations on the caregivers. ROA.545:1-15. Throughout her employment, Dolores Mason was never verbally counseled, let alone issued a written reprimand, regarding her performance or conduct. ROA.549:15-23. On the contrary, Cave repeatedly praised Dolores Mason for her hard work all the way up until her termination from employment. ROA.549:24-550:7.

Meanwhile, Cave apparently also liked what she saw in Melanie Mason and promoted her from caregiver to office assistant in January of 2017. ROA.602:11. Melanie Mason worked in the office part-time, Fridays through Sundays. ROA.602:12-16: ROA.636:7-9. Melanie Mason also continued doing caregiver work (classified as an "independent contractor") until the Spring of 2018. ROA.602:19-21. Never during her tenure with HOS was Melanie Mason counseled, reprimanded, or otherwise disciplined due to her performance or conduct. ROA.603:16-22.

This is not to say, however, that all was rosy for Melanie Mason while she worked at HOS. The company officed out of the Cave's home, and on Sundays, Melanie Mason was the only employee present in the home with Cave's husband, Patrick. ROA.605:11-16, ROA.474:9-14. As it turns out, Mr. Cave was quite the dirty old man. On Sunday mornings, he had a habit of loudly watching pornography, sometimes with the assistance of virtual-reality glasses, on his computer while Melanie Mason was working in the home. ROA.605:14-16, ROA.606:16-22. This understandably made Melanie Mason feel very uncomfortable and offended, and she considered it to be sexual harassment. ROA.606:13, *Id*. at 18, ROA.608:19-21.

For her part, Martha Cave was aware of her husband's conduct, ROA.474:2-8, ROA.513:6-10, and she conceded at trial that a young woman who was having to work in this environment could reasonably believe Patrick Cave's conduct to be

sexual harassment. ROA.477:15-20. Yet, Martha Cave did nothing to stop her husband from loudly watching pornography in the presence of employees. ROA.475:8-11, 513:7-12. Other employees confirmed Mr. Cave's behavior. ROA.550:20-24, ROA.474:2-8, ROA.513:6-10, ROA.728:7-12. HOS did not call Patrick Cave at trial to answer the allegations.

This was not, however, the full extent of Patrick Cave's sexually-harassing behavior towards Melanie Mason. He repeatedly joked that Melanie Mason would not join the rest of the office group for lunch because she was going to her father's apartment to have sex with men. This too made Melanie Mason feel very uncomfortable. ROA.606:24-607:13.

Melanie Mason complained to Martha Cave about Patrick Cave's sexually harassing behavior on three separate occasions. The first occurred at the end of January. Melanie Mason, joined by her mother, approached Cave and told her that she (Melanie Mason) felt uncomfortable working in the office on Sundays because Patrick Cave was loudly watching pornography. Martha Cave responded that she was too busy to talk at that moment and then promptly got on the phone. ROA.608:1-5, 13. Dolores Mason confirmed that this conversation in Martha Cave's office occurred and that her daughter Melanie complained of Patrick Cave watching pornography. ROA.550:16-551:20.

Melanie Mason next complained about Patrick Cave's sexual harassment at the beginning of March.  The Company's EEO poster was posted on the wall near Melanie Mason's desk.  Melanie Mason pointed to the poster and asked Martha Cave if she had read it.  Martha Cave responded that she had not but that she was familiar with what it says.  Melanie Mason then complained again about Patrick Cave watching pornography in the office on Sundays as well as about the sexual comments that Mr. Cave had made.  ROA.607:9-21, ROA.609:16.  Martha Cave again responded that she was too busy at the moment to address this situation. ROA.610:13-14.

Melanie Mason's third and final complaint of sexual harassment came on the morning of Friday, April 6, 2018, the day before Martha Cave discharged her and her mother from employment.  Because she was going to be again working alone with Patrick Cave that coming Sunday, Melanie Mason, after receiving encouragement from her mother, see ROA.556:17-557:3, again broached the issue of Patrick Cave watching pornography and how this made her feel uncomfortable. ROA.610:22-612:3.  Predictably at this point, Martha Cave again ignored this complaint.  ROA.612:22-25.  Because of Martha Cave's now apparent pattern of refusing to address the sexual harassment complaint, Melanie Mason resolved to contact the EEOC to make a complaint.  Melanie Mason told her mother that she was going to do so.  ROA.613:25.

Later that afternoon, Martha Cave received word that a client had called to report that a caregiver had not reported for her shift. Scheduling Coordinator Tiffany Rodriguez volunteered to go to the client's home if Dolores Mason would go with her. However, Dolores Mason declined to go because she had to pick up her 10-year-old daughter from school at 4:30pm, and if she went to the client's home, she would not be able to do so. ROA.552:25-553:3, ROA.502:15-503:4.

In fact, just the night before, Martha Cave had telephoned Dolores Mason to express concern about the caregiver in question and to ask Dolores Mason whether she could handle the caregiver's shift if the need arose. Dolores Mason had explained to Martha Cave on this call that she would not be able to do so because she had to pick up her daughter. Martha Cave expressed understanding during this call and did not press the matter further on the call. *Id.*

Because Dolores Mason was unable to cover for the apparently absent caregiver on the afternoon of April 6, Martha Cave and Scheduling Coordinator Tiffany Rodriguez resolved to go to the client's residence. ROA.503:24-25. However, while enroute to the client's home, they heard back from the client or caregiver and learned that the caregiver had been present at the client's home all along but was in the bathroom. So, Cave and Rodriguez proceeded back to the office. ROA.504:5-8.

Meanwhile, while Cave was away, Melanie Mason resolved that, given Martha Cave's absence from the office, this was her opportunity to contact the EEOC as she had planned. ROA.613:1-2, 25. Before doing so, she told her mother Dolores Mason that she was going to call the EEOC because Martha Cave had failed to address her complaint of sexual harassment. Melanie Mason then walked outside to make the call. ROA.557:13-558:3, ROA.613:5, ROA614:2-4. Unfortunately for the Masons, Patrick Cave and finance manager Victor Blalock were in the office and within earshot when Melanie Mason told her mother that she was going outside to contact the EEOC. ROA.558:4-15, ROA.613:6-8, ROA.557:7-11.

Melanie Mason placed the call and was on hold for approximately five to ten minutes waiting to speak to an investigator. However, before she could be connected to an investigator, Martha Cave and Rodriguez drove up. So, Melanie Mason had to hang up the phone. ROA.614:8-15. Thereafter, business continued as usual. Contrary to what Martha Cave and her two witnesses testified at trial, there was no yelling or screaming by the Masons. ROA.554:22-555:1, ROA.603:22-25, ROA.613:15-16, ROA.756:2-3. Nor were there any indications at the time that Martha Cave was considering terminating the Masons; for instance, Cave admits that she never reprimanded or otherwise addressed the alleged yelling with the Masons. ROA.485:9-486:1, ROA.505:4-7. Indeed, when Dolores departed for the day,

Martha Cave gave her the leftover pizza from the day's lunch to take home. ROA.563:2-4.

Unbeknownst to the Masons, Melanie Mason had been overhead, by Victor Blalock and/or Patrick Cave, telling her mother that she was going to make a complaint with the EEOC. ROA.558:4-15, ROA.613:6-8, ROA.557:7-11, ROA.646:18-22. That evening, Blalock and Rodriguez telephoned Cave to inform her that Melanie Mason had made a complaint with the EEOC. ROA.691:20-23, ROA.692:1-12, ROA.698:17-25, ROA.716:22-24, ROA.717:4-10.

On the following morning, Saturday April 7, 2018, Dolores Mason and Melanie Mason reported for work. They were met by Cave, who immediately discharged them from employment. ROA.564:14-18, ROA.616-17:24-15. When Cave announced to the Masons that they were both terminated, Melanie Mason commenced recording the meeting. ROA.564:17-18, ROA.617:16. Almost immediately thereafter, Dolores Mason implored Cave to talk to them. Cave responded, "I don't need to talk to you now—not after what you did yesterday." When Dolores Mason sought explanation for what she had done yesterday, Cave said, "what Melanie did—your daughter." ROA.635:4-9. And when Melanie Mason asked what she had done, Cave made a startling admission that revealed the reason for the terminations, angrily asking: "Didn't you send a complaint to the Labor Board?" *Id.* at 7-9. Melanie Mason reminded Cave that it is illegal to fire an

employee for making a complaint, to which Cave retorted that in the State of Texas she could fire them without a reason. ROA.73. It was only then, after Melanie Mason called her out on the retaliation, that Cave claimed that they had been on the "chopping block" for a long time, ROA.491:18-23, ROA.492:4-15, a claim that Cave was forced to admit at trial was not true and that she had no plans to discharge the Masons prior to April 6, 2018. ROA.493:7-20.

During the litigation, Cave would attempt to distance herself and downplay her telling comment about the "Labor Board," testifying in her deposition that it was the Masons, and not her, who first mentioned the Labor Board during the termination meeting. ROA.478:24-479, ROA.480:13-19. But at trial, she admitted that it was she who brought up the Labor Board. ROA.480:20-22. Cave was at a total loss to explain why she did so. "I have no idea why I said that." *Id.* at 13-19.

Sadly, Cave's anger towards the Masons did not subside after the termination. When Melanie Mason applied for a job with the U.S. Department of Defense a couple of months later, Cave received a request for reference regarding Melanie Mason from the Government. Cave responded that Melanie Mason had committed financial improprieties even though she conceded at trial that she had no evidence to support this disparaging allegation. ROA.500:5-501:3. In addition to causing the Mason's financial harm, the terminations affected the Mason's mental health. They experienced depression, anxiety, weight gain, and sleeplessness along with other

physical symptoms. They were diagnosed with depression and prescribed medications. ROA.500:12-16, ROA.623:1-2, 14-24.

**B.    Procedural Background**

The Masons filed this lawsuit on April 9, 2021 after having received their Notices of Right to Sue from the EEOC. They asserted claims for retaliatory discharge under Title VII of the Civil Rights Act of 1964. ROA.10-14. The parties stipulated that the Masons filed their EEOC charges within 300 days of their date of discharge and filed suit within 90 days of their receipt of the Notices of Right to Sue. ROA.268.

The parties consented to trial before U.S. Magistrate Judge Elizabeth Chestney (hereinafter referred to as the district court).

After the parties conducted discovery, HOS filed a Motion for Summary on May 9, 2022. HOS argued that it did not have the requisite number of employees to be subject to Title VII because its caregivers were contractors, not employees. ROA.93-100. On June 9, 2022, the district court entered a memorandum opinion denying HOS's Motion for Summary Judgment, concluding that issues of material fact existed as to whether the caregivers were in fact employees. ROA.217-234.

The parties subsequently consented to a non-jury trial before Magistrate Judge Chestney. ROA.235. The case proceeded to trial on the merits on August 29 and August 30, 2022. On October 13, 2022, the district court issued its Findings of Fact

and Conclusions of Law.  ROA.294-312.  The district court determined that HOS's caregivers were employees under the hybrid economic realities/common law control test, and as such, HOS employed a sufficient number of employees to be subject to Title VII, ROA.297, that HOS discharged Melanie Mason and Dolores Mason because of Melanie Mason's protected complaints, ROA.308, and that the Masons had both suffered lost wages and emotional distress, ROA.309-310.

The district court awarded Dolores Mason lost wages in the amount of $2,080.00 and emotional distress damages in the amount of $10,000.00.  ROA.310.  The district court awarded Melanie Mason $51,802.00 in lost wages and $10,000.00 in emotional distress damages.  ROA.310.  The district court also awarded $5,000.00 in punitive damages to both Dolores Mason and Melanie Mason.  ROA.310-311.

On October 31, 2022, the district court entered judgment in favor of Dolores Mason and Melanie Mason for the damages referenced above.  ROA.331-32.

## VIII.     SUMMARY OF ARGUMENT

Having lost on the merits at trial, Helping Our Seniors (HOS) asks this Court to ignore the substantial evidence supporting the district court's Findings of Fact and to substitute its judgment for that of the district court regarding the credibility of the witnesses and the weight to be afforded the evidence.

Contrary to HOS's position on appeal, the evidence supports the district court's determination that the dozens of caregivers employed by HOS to service its

clients were employees under the applicable hybrid economic realities/common law test, *see, e.g., Diggs v. Harris Hosp.-Methodist, Inc*., 847 F.2d 270, 271-72 (5th Cir. 1988), and as such, HOS was subject to Title VII of the Civil Rights Act of 1964 because it employed fifteen or more employees in 20 or more calendar weeks in the year of Plaintiff/Appellees discharge from employment.

In a nutshell, these unskilled hourly workers, many of whom had long-term work relationships with HOS, performed services that were an integral part of the Company's business.   Indeed, because the whole purpose of HOS is to provide caregiver services, the caregivers were the *raison d'etre* of the business.   The caregivers were not required to have prior experience.  Instead, they were oriented, trained, and tested by the Company.  They were evaluated annually (if not more frequently), and disciplined by the Company.  Upon pain of reprimand or discharge, caregivers were required to follow the Company's policies and procedures, including policies relating to required paperwork/recordkeeping, time and attendance, health and safety, performance and conduct standards, drug testing, client confidentiality, HIPAA, risk management and a host of others.

Caregivers had no investment in the business, had no opportunity for profit or loss, did not have to provide any tools, equipment, or supplies, and even had their few expenses (e.g., mileage and parking) fully reimbursed by the Company.  Other than the fact that they were required, as a condition of working for the Company, to

sign a non-negotiable "Independent Contractor" agreement, which incidentally stated that they were not allowed to subcontract or delegate their work to others, there is nothing at all in the record to even remotely suggest that they were truly independent contractors who were in business for themselves. They were, at the end of the day, unskilled workers toiling for an hourly wage. But by categorizing them as contractors, HOS was able to save on business expenses such as payroll taxes, workers compensation insurance, and perhaps most importantly, overtime compensation.

The evidence also supports the district court's determinations that Melanie Mason repeatedly complained of sexual harassment by HOS's owner's husband (who was a director in the Company) and then attempted to contact the EEOC on the day before her discharge to make a complaint. These complaints constituted protected activity under Title VII's opposition and participation clauses (42 U.S.C. Section 2000-e3(a)).

The district court also reasonably concluded that HOS discharged the Masons due to Melanie Mason's protected activities. As the district court pointed out in its Findings of Fact and Conclusions of Law, the evidence showed that HOS's stated reason for firing the Masons—supposed loud and prolonged outbursts in the workplace by Dolores Mason and Melanie Mason--was demonstrably false. The district court found HOS's owner, Martha Cave, not to be credible with respect to

her testimony regarding the reason for the Masons' discharge.  Then there is the issue of the timing of the discharge, which came less than 24 hours after Melanie Mason made her last complaint of sexual harassment and called the EEOC phone number listed on the EEO poster hanging on the office wall.

Perhaps most importantly, there is the recording of the termination meeting made by Melanie Mason, wherein Cave expressed animus towards Melanie Mason's effort to complain to the EEOC.  During the meeting, Cave told the Masons that she did not want to talk to them after what Melanie Mason had done the day before. When Melanie Mason asked what it was that she had done the day before, Cave angrily retorted, "didn't you send a complaint to the labor board?"  The evidence at trial established that the "labor board" was in fact a reference to the EEOC.

Although Cave attempted mightily to distance herself from her comment, for example previously claiming it was Melanie Mason who first mentioned the "labor board," she had to disavow her deposition testimony and admit that it was she, and not Melanie Mason, who first raised the topic.  Ultimately, Cave could not provide any reason for why she mentioned the labor board: "I have no idea why I said that;" "I have no explanation for that."  After being impeached, Cave also conceded that she learned the night before the termination that Melanie Mason had contacted the EEOC.  As the district court pointed out, it was not until after this comment and after Melanie Mason disclosed that she was recording the conversation, that Cave came

up with other reasons for the terminations.  In short, the district court reasonably concluded based on this recording as well as the other evidence that the Masons were discharged due to Melanie Mason's complaints.

Finally, the evidence certainly supports the district court's modest awards to the Masons for mental anguish and punitive damages.  Both Dolores and Melanie Mason testified regarding the depression and anxiety they suffered in the wake of the discharges, the medications they were prescribed, weight gain, and other symptoms.  The awards of punitive damages are also supported by the record.  Not only did Cave admit that she was well aware that it is illegal to discharge an employee for complaining of sexual harassment or for making a complaint with the EEOC, and yet proceeded with the terminations, but there was also troubling testimony from Cave herself that she attempted to sabotage Melanie Mason's efforts to obtain subsequent employment with the Department of Defense by falsely alleging to the government that Melanie Mason had engaged in financial improprieties, an allegation she knew to be false.  Malice may also be inferred from the fact that Cave fired Dolores Mason in retaliation for her daughter Melanie's complaint.  Regardless of whether Cave intended to injure Dolores because of what her daughter had done, or conversely, intended to harm Melanie by going after her mother, Cave's conduct is the epitome of mean-spiritedness and vindictiveness that deserved to be punished through the imposition of punitive damages.

# VIII. <u>ARGUMENT AND AUTHORITIES</u>

**A.     Standard of Review**

The Court of Appeals reviews conclusions of law de novo and findings of fact for clear error.  *See Switzer v. Wal–Mart Stores, Inc*., 52 F.3d 1294, 1298 (5th Cir.1995).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [the Court of Appeals] may not reverse even if [it is] convinced that, had [it] been sitting as the trier of fact, [it] would have weighed the evidence differently.  *Id*.  "When reviewing mixed questions of law and fact, this Court will reverse only if the findings are based on a misunderstanding of the law or a clearly erroneous view of the facts."  *Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001) (citing *Bose Corp. v. Consumers Union of U.S., Inc*., 466 U.S. 485, 501 (1984)).

**B.     HOS Had Requisite Number of Employees for Title VII Coverage Because the Company's Caregivers Were Improperly Classified as Contractors and Should Have Been Counted as Employees**

HOS's principal argument on appeal is that it was not subject to Title VII coverage because it did not employ the requisite number of employees.  Under Title VII, an employer is subject to the statute if it employed 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.  42 U.S.C. Section 2000e-3(b).  The parties agree that the

relevant years are 2018 (the year of the Masons' discharges from employment) and 2017 (the preceding year).  ROA.240.

HOS employed only a handful of employees in its office, but it also had approximately 70 caregivers (in both 2017 and 2018) who provided care to clients in their homes and at nursing homes.  ROA.416:19-417:2.  If the caregivers were employees, then HOS was subject to Title VII in both 2017 and 2018.  If the caregivers were properly classified as contractors, then HOS was not subject to Title VII for purposes of this lawsuit.

The parties agree that the hybrid economic realities/common law control test, first articulated by the D.C. Circuit in *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979), applies in determining whether those caregivers were employees or contractors.  Since *Spirides*, the Fifth Circuit has repeatedly endorsed this test.  *See Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 271–72 (5th Cir. 1988) (summarizing the test). This test considers "the economic realities of the work relationship, and the extent to which the one for whom the work is being done has the right to control the details and means by which the work is to be performed, with emphasis on this latter control factor."  *Id.* at 272; *see Deal v. State Farm County Mut. Ins. Co. of Tex.*, 5 F.3d 117, 119 (5th Cir. 1993) (explaining that right to control an employee's conduct is most important component of test.).

Regarding the control component, the Fifth Circuit has focused on "whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule." *Deal*, 5 F.3d at 119. The economic-realities component of the test focuses on the terms and conditions of employment, considering the following eleven factors:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision;

(2) the skill required in the particular occupation;

(3) whether the "employer" or the individual in question furnishes the equipment used and the place of work;

(4) the length of time during which the individual has worked;

(5) the method of payment, whether by time or by the job;

(6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation;

(7) whether annual leave is afforded;

(8) whether the work is an integral part of the business of the "employer;"

(9) whether the worker accumulates retirement benefits;

(10)   whether the "employer" pays social security taxes; and

(11)   the intention of the parties.

*Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158, 1160 (5th Cir. 1986).

As an initial matter, it is important to address the central theme of HOS's position on appeal:    that it operated strictly as a "matching" service that matches caregivers with clients.    Apparently, Martha Cave operated her business in this manner in its early years (before the business became HOS), but she acknowledges that she discontinued acting as a "referral" service around 2012.  ROA.449:21-450:13.

The district court carefully considered the facts and applied them to the elements of the test, concluding in the final analysis that "Plaintiffs have met their burden to establish that Helping Our Seniors' caregivers were employees, not independent contractors . . . ."  ROA.301.  Regarding the important common law control factor, the district court identified several key facts supporting its conclusion that HOS exercised "substantial control over the details and means by which the work was performed."  ROA.298.

The district court found several facts particularly significant.  ROA.297-99. First, new caregivers were required to undergo extensive orientations that involved reviewing and learning the Company's many written policies and procedures.  These policies and procedures covered a myriad of subjects, ranging from dress code, hours of work, scheduling pay day, recordkeeping (including the mandatory submission of Daily Activity Logs and Monthly Service Delivery Records), caregiver-client interactions, chemicals in the workplace, proper body mechanics, protective wear

HIPAA and client confidentiality, bloodborne pathogens, emergency preparedness, and pain management.  ROA.437:7-438:17, ROA.545:13, ROA.795, ROA.806, ROA859-981.[1]  To ensure that they were adequately prepared on the policies, new caregivers were required to take written quizzes on each of these policies.  ROA.434:19-24.  The district court found it significant that, "[a]s part of orientation, HOS also provided its caregivers with an orientation checklist, requiring each caregiver to initial each company policy, indicating assent to the practices governing the employment and caregiver-client relationship."  ROA.298, ROA.792-93.

New caregivers were also provided a policy called "Pay Days."  In addition to detailing the dos and don'ts of submitting hours, this policy contains a statement that says it all about the absolute control that HOS reserves over its caregivers.  "Reminder:  The Agency is the defining decision on all matters Client or Caregiver."  ROA.797.  Another document that new caregivers were required to sign, entitled "Requirements and Procedures," details mandatory procedures regarding hours and scheduling, dress code, client paperwork, and relationships with clients.  ROA.863-870.

---

[1] HOS maintains that some of these policies are no evidence of control because they are mandated by the State of Texas.  However, this hardly diminishes the fact that they are mandatory policies that the Company required caregivers to follow.  As Martha Cave acknowledged, although required by the State, they became Company policies when adopted.  ROA.434:4-13.

As the district court noted, caregivers sometimes received additional orientation/training when assigned to clients with special needs or requirements. ROA.467:17-468:18. Caregivers also received follow-on annual training conducted by the caregiver coordinator, which during the time periods relevant to this lawsuit was Dolores Mason. ROA.466:4-25, ROA.545:9-15.

HOS's control over caregivers did not end upon completion of the orientation process itself. For example, caregivers received annual written evaluations where their performance in multiple areas was graded. ROA.462:15-463:18, ROA.806, ROA.854. As the caregiver coordinator, it was actually Dolores Mason's job to do these evaluations. ROA.545:13. Caregivers were also subject to verbal and written discipline as well as discharge for violations of Company policies and procedures. While the Masons were employed, HOS even maintained a disciplinary form used for issuing written discipline to caregivers. ROA.439:18-440:25, ROA.463:10-25.

HOS argues that caregivers were free to turn down assignments and that this is strong evidence that the Company did not exercise strong control over caregivers' assignments. However, the district court observed that this was only true to a point, as caregivers were subject to termination if they turned down too many assignments. ROA.299, ROA.432:2-9. Additionally, the adhesive "independent contractor" agreements that all caregivers were made to sign prohibited caregivers from subcontracting their work. ROA.299, ROA.784 ("The Contractor may not assign

any of its rights or duties under this Agreement without the prior written consent of the Company."). Although Martha Cave initially maintained at trial that caregivers could in fact subcontract their work, she ultimately admitted that caregivers could not subcontract. ROA.432:19-25. Thus, on balance, the district court reasonably determined that HOS retained substantial right of control over the details and means by which the work was to be performed.

Turning to the economic realities portion of the test, the district court painstakingly analyzed the evidence against the various factors and reasonably concluded that these factors on balance favored a finding of employee status. To begin, the caregivers were/are low-skilled workers who performed household chores like cooking, light-cleaning, and assisting the clients with tasks such as bathing. ROA.411:23-412:25. The caregivers did not have to have a degree--a high school diploma or GED was sufficient--and they were not licensed by the State of Texas. ROA.428:7-20. Although HOS preferred that the caregivers have prior experience, it was not required. ROA.429:2-10, ROA.547:15. In fact, Melanie Mason had no prior experience when she went to work for the Company as a caregiver. ROA.429:17.

Caregivers were paid a low hourly wage of $10.00. They received extra for working on holidays. ROA.782: ROA.422:9. They were not required to procure insurance. The Company insured and bonded them at its own expense. ROA.783,

ROA.426:6-11.  They had no business expenses, ROA.423:9-424:5, and they did not have to provide their own supplies, ROA.430:17.  Nor did they have any investment in the business or any opportunity for profit or loss.  ROA.424:8-10.  The most that HOS can muster in this regard is that caregivers had to have auto liability insurance, but as the district court noted, this is the same requirement for all automobile owners in Texas.  ROA.300.

The longstanding relationships that many caregivers enjoyed with HOS also favors a finding of employment status.  This is a source of great pride for Martha Cave, who explained that when a client died or otherwise left HOS, she would attempt to find the caregiver another client.  ROA.429:18-430:14

Importantly, caregivers are absolutely integral to HOS's business, which is the provision of caregiving services in the San Antonio Metropolitan Area. ROA.411:15-19.  They are, in effect, the *raison d' etre* of the business.  As the district court concluded, this factor too strongly favors a finding of employee status. ROA.300.

HOS declares Kings X because all caregivers signed "independent contractor" agreements agreeing to be classified as contractors.  And as such, HOS did not pay or collect unemployment taxes and did not provide workers compensation or health insurance (although it did not provide health insurance to its employees either).  The district court did not find this evidence persuasive under the economic realities

analysis because the independent contractor agreements were essentially adhesion contracts.  ROA.301.  The undisputed testimony was that these contracts were non-negotiable.  ROA.540:10.  As such, the district court explained, the independent contractor agreements are "not reflective of the parties' mutual intent as to the structure of the employment relationship, only indicative of Helping Our Seniors' unilateral and self-serving desire to classify its caregivers as contractors."  ROA.301.  The Fifth Circuit explained in an analogous context under the Fair Labor Standards Act that labels are "dispositive only to the degree that the label mirrors the economic reality of the relationship." *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981).

In this case, the district court reasonably determined that the economic realities, along with the common law control favors, favored a finding that the caregivers were employees, not independent contractors.  This determination was well-founded based on the evidence and should not be disturbed on appeal.

## C.     The Record Supports the District Court's Determination that Melanie Mason Engaged in Activities Protected by Both the Opposition Clause and the Participation Clause

To begin, the district court was correct to conclude that Melanie Mason engaged in protected activity under both the "opposition clause" and the

"participation clause" of Title VII.[2]   These provisions are found at 42 U.S.C. Section 2000e-3(a) and provide in relevant part:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

As for opposition-clause protected activity, HOS argues on appeal that Melanie Mason never "opposed" the sexual harassment.  According to HOS, Melanie Mason only "tried to" speak with Martha Cave to report the sexual harassment, but never actually provided Cave with the details.  This is incorrect.

Melanie Mason testified that she specifically complained of sexual harassment to Martha Cave on three separate occasions—late January of 2018, again in early March of 2018, and finally, on April 6, 2018, ROA.608:1-6, 9-11, ROA.610:22-611:1, ROA.611:22-25, at one point even directing Martha Cave to the EEO poster hanging on the wall. ROA.608:9-16.  The last occasion was just the day before her termination from employment. ROA.610:22. On each of these occasions, Melanie Mason complained to Martha Cave that she (Melanie Mason) was

---

[2] Citing 42 U.S.C. Section 2000e-5(f)(1) and *Thompson v. N. Am. Stainless*, 562 U.S. 170, 177-78 (2011), the district court determined that, although she herself made no protected complaints, Dolores Mason was an "aggrieved person" who had standing to sue under Title VII based on her close relationship with her daughter Melanie Mason.  ROA.304-06.  HOS does not challenge this determination on appeal.

uncomfortable with Patrick Cave loudly watching pornographic movies on Sunday mornings when she had to work with him alone. Dolores Mason testified that she was present when Melanie Mason made one of these complaints. ROA.550:20-25. Unfortunately, on each of these three occasions, Martha Cave refused to address the issue, instead begging off by saying she was too busy to deal with the situation at the time. ROA.550:24-551:18, ROA.608:1-610:14, ROA.610:22-611:1-21, ROA.612:22-25

Victor Blalock, HOA's Financial Administrator, admitted at trial that Melanie Mason had also complained to him about having to work around Mr. Cave's viewing of pornography. ROA.627:3-6, ROA.728:7-12. Martha Cave and scheduling coordinator Tiffany Rodriguez also testified that they were aware of Mr. Cave's pornography habit. ROA.685:14-15. Although Cave was aware that her husband was watching pornography while Melanie Mason was working, she did nothing to stop this. ROA.473:1-8, ROA.474:2-8, ROA.513:6-10.

Lest there be any question, Melanie Mason believed that Patrick Cave's conduct constituted sexual harassment that made her feel uncomfortable and offended. ROA.606:13, *Id*. at 18, ROA.608:19-21. Martha Cave herself conceded that she could see how a young woman having to work environment might consider this sexual harassment. ROA.477:10. The district court therefore reasonably concluded that Melanie Mason's complaints to Martha Cave were based on her

good-faith, reasonable belief that Patrick Cave's conduct violated federal law and therefore constituted protected activity under the opposition clause.  *See* ROA.303.

The district court also correctly concluded that Melanie Mason's April 6, 2018 call to the EEOC constituted protected activity under the participation clause.  Part of 42 U.S.C. Section 2000e-3(a), the participation clause makes it unlawful for an employer to retaliate against an employee "because [s]he has made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing under this subchapter."  (emphasis added).

Federal courts have held that the phrase "in any manner" sweeps broadly and demonstrates a Congressional intent to confer exceptionally broad protection to employees complaining of retaliation.  *E.g., Pettway v. Am. Cast Iron Pipe Co*., 411 F.2d 998, 1006 n. 18 (5th Cir. 1969) (participation clause provides " "exceptionally broad protection"); *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166 (2d Cir. 2005); *Deravin v. Kerik*, 335 F.3d 195, 200 (3d Cir. 2003) ("explicit language is expansive and seemingly contains no limitations"); *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir.1988) ("The participation clause is broadly construed to protect employees who utilize the tools provided by Congress to protect their rights."); *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1312 (6th Cir.1989) (stating that "participation clause offers exceptionally broad protection"); *Pettway v. Am. Cast Iron Pipe Co*., 411 F.2d 998, 1006 n.18 (5th Cir. 1969) (participation clause

provides "exceptionally broad" protection); *Crevier-Gerukos v. Eisai, Inc*., 2013 WL 12137089, *6 (S.D. Tex., Jun. 24, 2013) (Rosenthal, J.); *Carpenter v. Miss. Valley State Univ*., 807 F. Supp.2d 570, 591 (N.D. Miss. 2011) ("Courts appear to consistently read this clause as evincing Congress's intent to confer broad protection under the statute.").

The courts explain that the participation clause was designed to ensure that Title VII protections are not undermined by retaliation against employees who use the Title VII process to protect their rights. *E.g., Brower v. Runyon*, 178 F.3d 1002 (8th Cir. 1999); *Pettway*, 411 F.2d at 1006 n. 18 ("The protection of assistance and participation in any manner would be illusory if employer could retaliate against employee for having assisted or participated in a Commission proceeding."). This is because retaliation may have a chilling effect regardless of whether the employer acts after or before the employee files a formal charge of discrimination. *Id*. As the Supreme Court has noted, albeit in a different context, the primary purpose of the anti-retaliation provisions of Title VII is to maintain "unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co*., 519 U.S. 337, 346 (1997).

Some courts have framed the issue as whether the employee has demonstrated that she was attempting to enforce Title VII rights. *Brower*, 178 F.3d at 1006 (finding participation protected activity where employee of government contractor visited EEO counselor and on the next day threatened to bring a civil suit); *Olsen v.*

*Marshall & Ilsley Corp*., 2000 WL 34233699, *18 (W.D. Wis., Sept. 7, 2000); *Croushorn v. Bd. of Trustees*, 518 F. Supp. 9, 23 (M.D. Tenn. 1980) ("conduct that predates or falls short of the actual filing of a charge deserves "participation" clause protection if it is an intimately related and integral step in the process of making a formal charge"). For instance, in *Polk v. Yellow Freight Sys., Inc*., 801 F.2d 190, 200 (6th Cir. 1986), the Sixth Circuit held that visiting a government agency to inquire about filing constitutes protected activity under Title VII's participation clause.

In this case, Melanie Mason first commenced and invoked the process of filing an EEOC charge on the afternoon of Friday, April 6, 2018. Because Martha Cave had failed to address her complaints of sexual harassment, Melanie Mason told Dolores Mason that she was going to contact the EEOC to file a complaint. ROA.613:25. Unbeknownst to Melanie Mason at the time, however, her remarks to her mother were overhead by other employees in the office. ROA.558:4-15, ROA.613:6-8, ROA.557:7-11. After Martha Cave left the office to visit a client, Melanie Mason took the opportunity to step outside and place a call to the EEOC to start the complaint process. She waited on hold for several minutes but was unable to speak to an investigator before Martha Cave returned to the office. Melanie Mason had to hang up and return to the office. ROA.614:8-15.

Although Melanie Mason was unable to speak to the EEOC at that time, her phone call nevertheless constitutes protected activity under the participation clause. Melanie Mason had previously made known to her mother (and heard apparently by others) of her intent to file a complaint of sexual harassment with the EEOC, ROA.558:4-15, ROA.613:6-8, ROA.557:7-11, and the purpose of her call to the EEOC was to file a complaint, as she had already exhausted efforts to seek redress through Martha Cave to no avail, ROA.550:24-551:18, ROA.608:1-610:14, ROA.610:22-611:1-21, ROA.612:22-25.   Thus, Melanie Mason's call was her attempt, albeit unsuccessful through no fault of her own, to commence the official process of enforcing her Title VII rights by filing a charge with the EEOC.   There also is no question that Martha Cave learned that Melanie Mason had contacted the EEOC,  ROA.691:20-23,  ROA.692:1-12,  ROA.698:17-25,  ROA.716:22-24, ROA.717:4-10, and based on her comments during the termination meeting recorded by Melanie Mason, believed that Melanie Mason had in fact formally filed a complaint, ROA.73.

HOS says that Melanie Mason's phone call should not be entitled participation-clause protection because Melanie Mason was unable to actually speak to an investigator.   But it cannot deny that Melanie Mason was attempting to formally enforce her Title VII rights by contacting the EEOC, which is the mechanism established by the statute itself.   If an employer is permitted to retaliate

against an employee under the circumstances, then the employer could, with impunity, cut off the employee at the knees by firing her upon learning of information that the employee is trying to file an official charge. It must be borne in mind that, as the Supreme Court emphasized in *Robinson*, the primary purpose of the anti-retaliation provisions of Title VII is to maintain "unfettered access to the statutory remedial mechanisms." Denying protection to Melanie Mason under the circumstances here would do exactly this.

## D. The Record Supports District Court's Determination that HOS Discharged the Masons Because of Melanie Mason's Protected Complaints

HOS next argues that the record does not support the district court's determination that Melanie Mason and Dolores Mason were discharged because of Melanie Mason's protected activities.[3] This argument lacks merit, as there is abundant evidence from which the district court could (and did) conclude that the Masons would not have been discharged but for Melanie Mason's protected activities. As evident from the Findings of Fact and Conclusions of Law, the district court considered and analyzed all of the evidence, weighed the credibility of the

---

[3] HOS contends that the Masons alleged only that they were discharged because of Melanie Mason's call to the EEOC, and t hat they did not also allege that they were fired because of Melanie Mason's complaints of sexual harassment. This is not so. They alleged that they fired in retaliation for both Melanie Mason's internal complaints to Martha Cave (i.e., opposition clause protected activity) and Melanie Mason's call to the EEOC (i.e., participation clause protected activity. *See* ROA.116 ¶8 (Original Complaint); ROA.266 (Joint Pretrial Order, Section 5(b)).

witnesses and their testimony, and ultimately found in favor of the Masons based on the totality of the record.

Indeed, in arguing that HOS discharged Melanie Mason and Dolores Mason for their supposed continuous yelling and outbursts throughout the workday of April 6, 2018, HOS ignores substantial evidence showing that this explanation for the termination was pretextual. Truth be told, in advancing its argument, HOS completely ignores much of the evidence supporting the district court's finding of retaliation.

The record demonstrates that HOS, through its owner Martha Cave, had animus against Melanie Mason's protected activities. For one, on each of three occasions when Melanie Mason complained of sexual harassment to Martha Cave, Cave ignored the complaint, claiming she was too busy to deal with it at the time. ROA.550:24-551:18, ROA.608:1-610:14, ROA.610:22-611:1-21, ROA.612:22-25. Likewise, Melanie Mason complained about the sexual harassment to Financial Administrator Victor Blalock. ROA.627:3-6, ROA.728:7-12. His response was to laugh it off. ROA.627:9-12. Predictably, he chose not to discuss the matter with Martha Cave. ROA.721:7-12.

Martha Cave's refusal to address the sexual harassment is telling. She admitted at trial that she was aware that her husband watched pornography on Sunday mornings when Melanie Mason was working. ROA.474:4-7. Martha Cave

also acknowledged at trial that she could see how a young woman like Melanie Mason could perceive having to work under these circumstances as sexual harassment. ROA.477:10. Yet, Martha Cave ignored Melanie Mason's complaints and never told her husband to refrain from watching pornography while other employees were present in the building. ROA.475:14.

Martha Cave also clearly expressed animus against the news that Melanie Mason had made a complaint to the EEOC. In the termination meeting recorded by Melanie Mason, Dolores Mason implored Cave to talk to them. Martha Cave angrily responded, "I don't need to talk to you now—not after what you did yesterday." Dolores Mason asked what she had done yesterday. Martha Cave then said, "what Melanie did—your daughter." When Melanie Mason asked what she had done, Cave angrily asked: "Didn't you send a complaint to the Labor Board?" ROA.635:8-9, ROA.73. As the district court found, this was a telling admission regarding the true reason for the terminations from employment. Indeed, if this is not a direct admission of retaliation, it comes very close.

In her deposition, Martha Cave had testified that it was Melanie Mason who first mentioned the "Labor Board," a claim she initially reiterated at trial, evening gong so far as to testify that "I was not aware of her calling anybody until she told me she did." ROA.478:24-479:6. But after being impeached with the termination recording, she had to admit that this was not correct. ROA.480:16-481:3. Martha

Cave was at a complete loss to explain why, if Melanie Mason's call to the EEOC played no role in the termination decision, she mentioned the Labor Board. "I have no idea why I said that;" "I have no explanation for that." ROA.480:18-19. Martha Cave was also impeached regarding her testimony that she did not know that Melanie Mason had called the EEOC until Melanie told her so. Specifically, she was impeached with her prior testimony during Dolores Mason's unemployment compensation appeal hearing that she learned about Melanie Mason's call to the EEOC from Victor Blalock and Tiffany Rodriguez. ROA.487:18-491:7.

Next, as the district court detailed in its Findings of Fact and Conclusions of Law, the Masons offered substantial evidence demonstrating that HOS's stated reason for termination was pretextual. Martha Cave steadfastly maintained throughout the trial that she discharged the Masons because they were yelling at each other throughout the day on April 6, 2018. ROA.481:6-8. Yet, as the district court observed, the evidence severely undermined this explanation.

First, Melanie Mason and Dolores Mason adamantly denied yelling at each other or anyone else at work on April 6, 2018. ROA.550:15, ROA.554:14-21, ROA.603:23-25, ROA.613:15-21. Martha Cave's claim that the Masons were yelling at each other throughout the day was supported by only one witness—Tiffany Rodriguez - a current employee whose testimony the district court characterized as "exaggerated" and "inconsistent." ROA.307.

Second, when pressed for details about what the Masons argued about or what they said to each other, Martha Cave could provide no explanation. ROA.484:5-8, 13-14, ROA.504:1-7. Nor could she credibly explain why, if she had heard all of this yelling, arguing, and disruption, she failed to address it at the time and put a stop to it. The best that she could muster was that she was "busy" with other matters. ROA.484:7-485:23.

Third, in the recorded termination meeting, Martha Cave makes no mention of yelling, screaming, or arguing as the reason for the Masons' terminations from employment. ROA.73. Indeed, Martha Cave conceded as much on cross examination. ROA.483:7. As noted, the first indication of a reason for termination came when Martha Cave questioned Melanie Mason about a complaint to the Labor Board. ROA.635:5-12. Then, when Melanie Mason stated that she could not fire someone for making a complaint, Cave had the perfect opportunity to say that she was not firing them due to the EEOC complaint and that she was actually firing them because of their purported yelling and carrying on the prior day. But she did not do so. Instead, what Martha Cave actually said was that in the State of Texas she did not need a reason for termination. ROA.73.

It was only after Melanie Mason disclosed that she was recording the conversation that Martha Cave stated that they had been on the "chopping block" for quite some time. ROA.492:4-15. But at trial, Martha Cave admitted this was not

actually true. She testified that she had no plans to discharge the Masons prior to April 6, ROA.491:9-17, ROA.493:20, as neither Melanie Mason nor Dolores Mason had done anything up until April 6 to warrant dismissal. ROA.493:7-17.

This is no wonder. Martha Cave essentially conceded that the Masons were good employees. She had promoted Dolores Mason because she was impressed with her, ROA.464:23, and she characterized Dolores Mason as a good employee. ROA.464:24. She even told Dolores Mason that she was doing a good job on various occasions. ROA.464:3. In fact, less than six months before the discharge, Dolores Mason had received a "pretty good" evaluation that consisted mostly of "exceeds expectations" ratings. ROA.465:23, ROA.467:4, ROA.851. Dolores Mason was never over the course of her employment verbally counseled or issued a written reprimand for any reason whatsoever. ROA.549:15-23.

Melanie Mason likewise had had a successful tenure with HOS. She had received a raise in February of 2018, ROA.604:3-9, and she never received any discipline, ROA.603:16-22. Certainly, if the Masons had long been on the "chopping block" as Martha Cave first alleged after learning that she was being recorded, they would not have received the raises, promotions, and praise heaped on them prior to Melanie Mason's complaints of sexual harassment.

What is more, if Melanie Mason was such a bad employee, then why did Cave offer her reinstatement several months after the discharge? As Martha Cave

admitted, this offer of reinstatement was completely inconsistent with the notion that Cave truly believed that Melanie Mason had engaged in a prolonged yelling match with her mother.  ROA.496:18, ROA.496:22-497:3.[4]

Finally, one cannot overlook the close timing between Melanie Mason's protected activities and the discharge from employment.  Melanie Mason made her third and final complaint of sexual harassment to Martha Cave on April 6, 2018, ROA.556:17-557:3, and on the same day, after being again put off by Cave, placed her call to the EEOC.  ROA.557:13-558:3, ROA.613:1-2.  That same evening, Victor Blalock and Tiffany Rodriguez called Martha Cave to advise her that Melanie Mason had made a complaint to the EEOC. ROA.691:20-23, ROA.692:1-12, ROA.698:17-25, ROA.716:22-24, ROA.717:4-10.  The very next morning, April 7, 2018, Martha Cave discharged Melanie Mason and Dolores Mason.  ROA.564:14-18, ROA.616-17:24-15.  This extremely close timing is powerful evidence that HOS discharged the Masons due to Melanie Mason's protected activities.

For all these reasons, the district court's determination that the Masons would not have been discharged but for Melanie Mason's protected activities was reasonable and well supported by the record.

---

[4] At trial, Martha Cave provided the incredulous excuse that the offer of reinstatement was made on the recommendation of her prior attorney and that is why she ultimately fired the lawyer too. ROA.496:21, ROA.497:5.

**E.     Record Supports Award for Mental Anguish Damages**

HOS next argues that the district court erred in awarding Melanie and Dolores Mason mental anguish damages in the amount of $10,000.00 each.  HOS contends that there is no evidence to support these awards.  However, the record contains substantial evidence supporting these awards.

The Court of Appeals reviews awards of mental anguish damages for abuse of discretion.  *Migis v. Pearle Vision, Inc*., 135 F.3d 1041, 1045 (5th Cir. 1998). Mental anguish damages may be awarded where there is "some specific discernable injury to the claimant's emotional state."  *Id*. at 1046.  In *Migis*, for instance, this Court upheld a trial court's mental anguish award of $5,000.00 where the evidence consisted solely of the plaintiff's testimony that her termination came without warning, was a "major inconvenience," and resulted in low self-esteem as a result of her termination from employment and the financial hardship that followed.  *Id*.

Similarly, in *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), a cased relied upon by *Migis*, the Fifth Circuit upheld a mental anguish award of $7,500.00 based on the plaintiff's testimony that she felt "very embarrassed, very belittled," "very disgusted," "hopeless," "about two inches high," and "started to feel pretty stupid" as a result of the harassment. She also felt that she must "have done something wrong to deserve somebody to talk to me like that."  This testimony was corroborated by a co-worker, who explained that after the harassment at issue in the

case, the plaintiff began to go everywhere with her because she believed there was safety in numbers. 97 F.3d at 809

A few years later, in *Oden v. Oktibbeha County*, 246 F.3d 458, 470 (5th Cir. 2001), this Court affirmed a jury award for emotional distress damages in the amount of $20,000 where the plaintiff testified, without any apparent corroboration, that he suffered stress, sleeplessness, betrayal, and shame. And in *Vaughn v. Sabine County*, also a Title VII case, this Court affirmed a jury's award of mental anguish damages of $50,000.00 to two plaintiffs (reduced by the district court from $100,000.00 each due to Title VII's cap on damages) based on the plaintiffs' testimony about the anxiety, sleep loss, and humiliation they experienced due to their loss of well-respected jobs in the community. 104 Fed. Appx. 980, *6 (5th Cir., Jul. 28, 2004).

In this case, both Dolores and Melanie Mason offered compelling evidence, credited by the district court in its Findings of Fact and Conclusions of Law, supporting the awards of mental anguish damages. With respect to Dolores Mason, she testified that she became depressed, had to move to Wichita Falls, Texas to live with her other adult daughter because she could no longer afford her apartment, was prescribed medication for depression by her physician (Dr. Godwin), lost her appetite and consequently lost 25 pounds, could not sleep thinking about what had happened to her, and felt particularly bad watching what her daughter Melanie was going through. ROA.572:12-20, ROA.573:4-25, ROA.588:15-591:7, ROA.594:21-

25. Therefore, the evidence of mental anguish damages adduced by Dolores Mason more than adequately support the district court's modest award of $10,000.00.

HOS separately argues that the district court committed reversible error by excluding a line of questioning regarding what it now characterizes in its Brief as "other similar and contemporaneous events that could have contributed to the alleged mental anguish suffered by Dolores." Specifically, HOS says that it should have been allowed to question Dolores Mason regarding the circumstances under which she lost her nursing license years before. The district court sustained the Masons' relevancy objection. HOS did not ask to make an offer of proof.

Federal Rule of Evidence 103(a) permits a party to claim error in a ruling to exclude evidence only "if the error affects a substantial right of the party" and "a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Fed. R. Evid. 103(a)(2). This circuit "will not even consider the propriety of the decision to exclude the evidence at issue, if no offer of proof was made at trial." *United States v. Winkle*, 587 F.2d 705, 710 (5th Cir. 1979). Although a formal offer is not required to preserve error, the party must at least inform the district court "what counsel intends to show by the evidence and why it should be admitted." *United States v. Ballis*, 28 F.3d 1399, 1406 (5th Cir. 1994). HOS failed to do so.

Regardless, the district court was right to sustain the relevance objection. Dolores Mason's emotional response years before to the loss of her nursing license has no bearing on the emotional distress she suffered as a result of her discharge from HOS.

Turning to Melanie Mason, she likewise offered evidence that supported the district court's award of $10,000.00 in mental anguish damages. She testified that she suffered from depression, anxiety, lack of motivation, and weight gain of twenty pounds. The depression and anxiety resulted in treatment from a therapist and from a psychiatrist, who prescribes her anti-depressants. She detailed how the anti-depressants did not work entirely well, and for over a year, her physician worked with her in changing the anti-depressants to find one that worked. Melanie Mason also described the guilt she felt, and continues to feel to this day, over causing her mother's termination as well as the humiliation she experienced when she was asked as part of a background check regarding this lawsuit against her former employer. She also testified that she discovered during the process of applying for subsequent employment that Ms. Cave had falsely reported to prospective employers that she (Melanie Mason) had engaged in financial improprieties while working for HOS. Melanie Mason testified that to this day, she continues to suffer from depression and anxiety that she attributes to her discharge. ROA.625:17-626:16, ROA.656:18-659:25.

Because the evidence supports the district court's modest awards of compensatory damages to Dolores and Melanie Mason, HOS's argument on appeal should be rejected.

## F.    Evidence Supports the Award of Punitive Damages

Punitive damages in a Title VII case are recoverable if the plaintiff shows that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."   42 U.S.C. § 1981a(b)(1).   "The availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's egregious conduct." *EEOC v. E.I. Du Pont de Nemours & Co*., 480 F.3d 724, 732 (5th Cir.2007) (citing *Kolstad v. Am. Dental Assn,*, 119 S.Ct. 2118, 2124 (1999)).   Both terms, "malice" and "reckless indifference," relate to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Wantou v. Wal-Mart Stores Texas, LLC*, 23 F.4th 422, 439 (5th Cir. 2022).

The Fifth Circuit neatly explained the requisite standard for punitive damages under Section 1981a in *Henry v. CorpCar Servs. Houston, Ltd*., 625 Fed.Appx. 607, 614 (5th Cir. Jan. 27, 2015):

> Malice has been described as "evil motive or intent," and reckless indifference has been described as "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Kolstad*, 119 S.Ct. at 536, 119 S.Ct. 2118 (quoting *Smith v. Wade*, 461 U.S. 30, 37 n. 6, 41, 56 (1983)). "Pointing to evidence of an employer's egregious behavior would provide one means of

satisfying the plaintiff's burden to 'demonstrate' that the employer acted with the requisite 'malice or ... reckless indifference,'" but "an employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for punitive damages award." *Id*. at 539, 546, 119 S.Ct. 2118 (quoting 42 U.S.C. § 1981a(b)(1)).

In the recent *Wantou* case, this Court affirmed a jury's finding that the employer had acted with malice in discharging the plaintiff from employment. This Court concluded that the evidence supported the requisite mens rea because the decisionmaker had been trained on the employer's anti-retaliation policy, and despite this knowledge, retaliated against the plaintiff. Moreover, because of the evidence describing the decisionmaker's animus towards, and conflict with, the plaintiff, the jury reasonably found that the decisionmaker acted with malice. 23 F.4[th] at 440.

In the same way here, the district court reasonably concluded that HOS, through its owner Martha Cave, discharged the Masons in retaliation for Melanie Mason's protected complaints with full knowledge that such retaliation is illegal. The record evidence also supports the finding that HOS acted with a motive to cause the Masons injury, or at least with reckless indifference to the risk that her actions would injure the Masons.

To begin, Martha Cave, the owner and sole decisionmaker with respect to the terminations, testified at trial that, at the time she discharged the Masons, she knew that the law prohibited discrimination, sexual harassment, and retaliation against an

employee for complaining of sexual harassment or making a complaint to the EEOC. ROA.446:13-21, ROA.476:13, ROA.511:2-5. Indeed, Cave had prominently displayed in the workplace an EEO poster that stated precisely this. ROA.476:3-19. And if there was any question, Cave admits that Melanie Mason referred her to read this poster on an occasion prior to the termination. ROA.475:12-22. And during the termination meeting itself, Melanie Mason reminded Cave that it is illegal to fire someone for complaining to the EEOC. ROA.73. Yet, Cave pressed forward with the terminations. Cave's justification at the time was that in the State of Texas she could fire an employee for any reason. *Id.* But given her subsequent admission that she knew that the law prohibited retaliation under the circumstances, one sees the Cave was dissembling, and more to the point, was acting with full knowledge that she was violating federal law.

What is particularly striking about this situation is the animosity that Cave displayed towards the Masons due to Melanie Mason's complaints. As the district court observed in its Findings of Fact and Conclusions of Law, Cave went out of her way to try to injure Melanie Mason financially by preventing her from obtaining employment with the Department of Defense. See ROA.500:5-22. Specifically, when the Department of Defense contacted Cave regarding a reference for Melanie Mason, who was applying for a job at Patrick Space Force Base, Cave reported that Melanie Mason had acted improperly in a financial way. ROA.500:8-501:3. She

admits she disparaged Melanie Mason. ROA.501:8. Yet, at trial, Cave could not identify any such improprieties and instead acknowledged it was just a hunch. ROA.500:19-22.

As the district court also observed in its Findings of Fact and Conclusions of Law, the notion that Cave actually believed that Melanie Mason had engaged in any kind of impropriety—financial or otherwise—is seriously undercut by Cave's subsequent decision to make Melanie Mason an unconditional offer of reinstatement. ROA.496:18. At trial, Cave sought to downplay this significant fact by testifying that she did so only on the advice of her prior legal counsel, who she subsequently discharged apparently for giving her this advice. ROA.496:3-21. But this hardly changes the reality that Cave ultimately approved the offer of reinstatement.

All of this is to say that district court reasonably concluded that HOA, through Cave, intended to do harm to Melanie Mason by lying about her to Mason's prospective federal employer. Coupled with the evidence that Cave discharged Melanie Mason knowing that retaliation against an employee for complaining about sexual harassment and for contacting the EEOC is illegal, the district court reasonably determined that a punitive damages award of $5,000.00 was appropriate. If anything, under the circumstances, HOS is lucky that the district court imposed such a modest award.

HOS's treatment of Dolores Mason was no less malicious. In this regard, the recording of the termination meeting demonstrates that Cave discharged Dolores Mason because of her association with her daughter, Melanie Mason:

Cave:       I don't need to come talk to you now, not after what you did yesterday.

Dolores:    What I did?

Cave:       Uh-huh. What Melanie did, your daughter.

Melanie:    What did I do?

Dolores:    What did she do?

Melanie:    I am right here. Talk to me—

Cave:       Didn't you—

Melanie:    Martha—

Cave:       Didn't you send a complaint to the Labor Board?

Melanie:    No. I did not send a complaint to the labor board.

Cave:       Okay. Then what are you all—

Melanie:    I called them to ask them a question and you cannot fire somebody for making a complaint, Martha.

Cave:       In the State of Texas, you can fire somebody without any reason.

ROA.73

Whether Cave's aim was to harm Dolores Mason or her daughter, this is the epitome of mean-spiritedness and evil motive, firing someone not for what they did but instead because of their close association with someone who engaged in

protected activity.  At trial, Cave expressed no remorse, and boldly stated that she stood by the termination decisions, ROA.497:6-9, even bringing a claim against the Masons for attorney fees with the hope that the court would punish the Masons. ROA.497:12.  Again, the district court's decision to award Dolores Mason $5,000.00 is supported by the evidence and was eminently reasonable.

## **CONCLUSION**

Appellees Melanie Mason and Dolores Mason pray that the Court affirm the district court's judgment in their favor in all respects.  Appellees also pray for all other relief to which they are entitled.

Respectfully submitted,

/s/Michael V. Galo, Jr.
**Michael V. Galo, Jr.**
State Bar No. 00790734
mgalo@galolaw.com
Galo Law Firm, P.C.
4230 Gardendale, Bldg. 401
San Antonio, Texas 78229
Telephone: (210)616-9800
Facsimile: (210)616-9898

**Certificate of Service**

This is to certify that the foregoing instrument has been served via the Court's EDF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on June 13, 2023, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

/s/Michael V. Galo, Jr.
**Michael V. Galo, Jr.**

**Certificate of Compliance**

1. This brief complies with the type-volume limitation of Fed R. App. P. 32(A)(7)(B) because:

   - this brief contains 12,433 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2. This brief also complies with the typeface requirements of Fed. R. App. P. (32(A)(5) and they type requirements of Fed. R. App. P. 32(A)(6) because:

   - This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with a 14 point, Times New Roman font.

/s/Michael V. Galo, Jr.
**Michael V. Galo, Jr.**
**Attorney of record for**
**Appellees Melanie Mason**
**And Dolores Mason**

Dated: June 13, 2023